UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALETHA HICKS,

                    Plaintiff,              Case No. 12-13581
                                              Honorable Robert H. Cleland
                                              Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 13]

Plaintiff Aletha Hicks ("Hicks") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [9, 13], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.     RECOMMENDATION

For the reasons set forth below, the court finds that the Administrative Law Judge ("ALJ") erred in failing to consider Hicks' mental impairment when evaluating her residual functional capacity. As such, the ALJ's conclusion that Hicks is not disabled under the Act is not supported by substantial evidence. The court recommends that the Commissioner's Motion for Summary Judgment [13] be DENIED, Hicks' Motion for Summary Judgment [9] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be

REMANDED back to the ALJ for further proceedings consistent with this Recommendation.

## II.    REPORT

### A.    Procedural History

On August 27, 2009, Hicks filed an application for DIB, alleging disability beginning on September 1, 2006.  (Tr. 115-21).  Her claim was denied initially on March 18, 2010.  (Tr. 61-64).  Thereafter, Hicks filed a timely request for an administrative hearing, which was held on March 10, 2011, before ALJ Theodore Grippo.  (Tr. 18-42).  Hicks (represented by attorney Andrea Hamm) testified at the hearing, as did vocational expert ("VE") Alberto Sadowski.  (Tr. 21-42).  On March 25, 2011, the ALJ found that Hicks was not disabled.  (Tr. 47-56).  On August 2, 2012, the Appeals Council denied review.  (Tr. 1-5).  Hicks filed for judicial review of the final decision on August 14, 2012 [1].

### B.    Background

#### 1.    Disability Reports

In an October 8, 2009 disability field office report, Hicks reported that her alleged onset date was September 1, 2006.  (Tr. 133).  During a face-to-face interview, the claims examiner noted that Hicks had difficulty standing, concentrating, answering questions, and with coherency.  (Tr. 134).  The claims examiner further observed:

> The claimant was a very nice lady.  Her behavior seemed to be normal at the beginning but after a few minutes into the interview she started becoming confused.  She had trouble remembering dates and became very frustrated during the questions of the interview.  The frustration turned into slight crying and discomfort….

(Tr. 135).

In an October 8, 2009 disability report, Hicks indicated that her ability to work is limited by numerous conditions, including hyperthyroidism, hypertension, diabetes, blurred vision, short term memory loss, severe migraines, anxiety, and depression.  (Tr. 137).  When describing how

2

these conditions limit her ability to work, Hicks stated:

> I am in severe pain all over body, I cannot lift things, frequent crying spells, frequent diarrhea, frequent urination, always going to bathroom, cramps, sometimes my back locks up and I cannot get out of bed, sometimes I have to use a BED PAN, sometimes I cannot think about anything because the pain is so severe, my hands shake where I cannot hold things, cannot sit and stand for long periods time, trouble moving altogether.

(*Id.*).  Hicks reported that these conditions first interfered with her ability to work in July of 2006, and that she became unable to work on September 1, 2006.  (*Id.*).  She has not worked since that time.  (*Id.*).  When asked why she stopped working, Hicks said, "I was having trouble doing my job because of my conditions.  I just could not do the work.  I had trouble with lifting and moving around.  I was also having trouble with my mental state.  As a result I was laid off from work and my salary until 09/2006."  (*Id.*).

Hicks completed college in 2000 and worked as an elementary school teacher (from 2000 through July 2006).  (Tr. 138, 143, 146).  In that job, she provided educational instruction and curriculum planning.  (*Id.*).  She was required to walk and stoop six hours per day; stand, kneel, and crouch five hours per day; sit, climb, and crawl three hours per day; and reach and handle large and small objects eight hours per day.  (*Id.*).  She was frequently required to lift 10-20 pounds, and the heaviest weight she lifted was 20 pounds.  (Tr. 138-39).

Hicks reported being seen by several medical providers regarding her conditions.  (Tr. 140-42).  She reported taking several medications, including Dyazide (for high blood pressure), Glucophage (for diabetes), and Synthroid (for her thyroid disorder).  (Tr. 142-43).  These medications produced side effects, including headaches, cramps, nausea, diarrhea, and gastral disorders.  (*Id.*).  She further reported having had a blood test, an EKG, and ultrasounds of her upper and lower body.  (Tr. 143).

In a function report dated November 2, 2009, Hicks reported that she lives in a house

with her family.  (Tr. 158).  She indicated that she wakes up at 5:30 a.m., attends to her personal

hygiene, reads the Bible, takes her medication (because she is "usually in a lot of pain"), eats

breakfast, and then returns to bed because her head aches and her back hurts.  (*Id.*).  After

resting, she might go to a doctor's appointment, watch television, or use the computer to research

her illnesses.  (*Id.*).  She goes to Bible study in the afternoon, and then returns to "eat, relax and

read."  (*Id.*).  When asked what she used to be able to do that she can no longer do, Hicks said

stand, sit, walk, stoop, and bend for long periods of time.  (Tr. 159).  She has difficulty sleeping

because of neck and back pain; numbness in her hands, arms, and legs; headaches;

stomachaches; irritable bowels; and frequent urination.  (*Id.*).  She has difficulty buttoning her

clothes, getting into and out of the bathtub, caring for her hair, and climbing stairs.  (*Id.*).  She

does not need reminders to take medication or attend to personal care.  (Tr. 160).  She is able to

prepare her own meals on a daily basis.  (*Id.*).  She can wash dishes, make her bed, do laundry,

and go shopping.  (Tr. 160-61).  She goes outside daily and can drive.  (Tr. 161).  She can pay

bills, count change, handle a savings account, and use a checkbook.  (*Id.*).  Her hobbies include

surfing the internet, reading, listening to music, attending movies, plays and church activities,

and talking with her family, all things she does daily or regularly.  (Tr. 162).  She claims, though,

that she does not engage in these activities as often as she would like because she gets "sick and

exhausted easily."  (Tr. 162-63).  She does not have any problems getting along with family,

friends, or neighbors.  (Tr. 163).

     When asked to identify functions impacted by her condition, Hicks checked lifting,

squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing,

memory, completing tasks, concentration, and using her hands.  (Tr. 163).  She explained,

"Sometimes I'm in such pain all I want to do is cry and lay down, or go to see the doctor for help

and advice." (*Id.*).  She can walk one block before needing to stop and rest for 10-15 minutes. (*Id.*).  She can pay attention for 20 minutes.  (*Id.*).  She is able to finish what she starts and follow written and spoken instructions.  (*Id.*).  She gets along well with authority figures, handles stress "as well as expected," and handles changes in routine "as well as [she] can."  (Tr. 164).  She uses a cane on her "extremely difficult days," but this was not prescribed by a doctor.  (*Id.*).

In a third party function report dated December 15, 2009, Hicks' husband, Rodney Robinson, reported that Hicks reads her Bible and spends a lot of time in the bathroom.  (Tr. 170).  He indicated that Hicks has trouble sleeping and complains of excruciating pain.  (Tr. 171).  Robinson helps Hicks into and out of the bathtub, and says that she also has trouble getting in and out of bed.  (*Id.*).  He indicated that Hicks prepares meals daily, but cannot stand over the stove for too long.  (Tr. 172).  Robinson does "most of the chores," but Hicks does the dishes and irons.  (*Id.*).  According to Robinson, Hicks reads, watches television, and listens to music, although she "can't enjoy life like she once did."  (Tr. 174).  She does go out to dinner and to church, and she visits family and friends on a weekly basis.  (*Id.*).  She finishes what she starts and is able to follow written and spoken instructions.  (Tr. 175).

In an undated disability appeals report, Hicks reported that, beginning in approximately October of 2009, her conditions changed for the worse.  (Tr. 202).  Specifically, her glucose levels were rising, her blood pressure was higher, she continued to have pain, and was "very depressed" because her condition was not improving at all.  (*Id.*).  She had not sought treatment for emotional or mental problems since the time of her last report.  (Tr. 203).  She continued to experience "physical discomfort all over [her] body, dizziness, irritable bowel, frequent urination, severe headaches, anxiety, depression, skin breakout, weakness, poor appetite, stomach cramps, and pain."  (Tr. 206).

5

2.      *Plaintiff's Testimony*

At the March 10, 2011 hearing before the ALJ, Hicks testified that she lives in a house with her husband. (Tr. 22). She has three adult children and eight grandchildren. (*Id.*). Her husband and her children help her with household chores, including cooking and cleaning. (Tr. 22-23). On a typical day, Hicks reads the Bible, prays, attends to her personal hygiene, makes small meals, and gets on the computer (to play math games or chess, or to research her ailments). (Tr. 24). When she is not having a "rough day," Hicks is able to do the dishes, make her bed, do some light dusting, and clean the bathroom. (Tr. 23). She is able to go grocery shopping with her husband; sometimes she walks through the store, and other times she rides a scooter. (Tr. 33). Some days, however, Hicks just lies in bed all day. (Tr. 24).

Hicks testified that she suffers from migraine headaches. (Tr. 25). She gets these headaches every day, and they might last "all day," but she takes only ibuprofen for them and lies down with "cold packs" on her head. (*Id.*). According to Hicks, her doctors have told her that these migraine headaches are related to her "illness and [her] depression." (Tr. 25-26). She also experiences swelling and numbness in her joints, backaches, muscle and joint aches, rheumatoid arthritis, dizziness, nausea, blurred vision, frequent urination, irritable bowel syndrome, and bleeding hemorrhoids. (Tr. 25-28). She has trouble sitting or standing for long periods of time. (Tr. 26). According to Hicks, even on a "good day," she spends two or three hours lying down in bed to alleviate pain. (Tr. 27). When asked which of her ailments causes her the most problems, she said irritable bowel syndrome and insomnia. (Tr. 29). She has difficulty sleeping because of pain and a frequent need to go to the bathroom, although the sleep aid (Cymbalta) prescribed by her psychiatrist is helpful at times. (Tr. 30-31).

Hicks also testified that she can sit for only 20-30 minutes at a time because it causes

numbness in her hands and legs. (Tr. 31). She cannot stand at all without leaning on something, because she experiences pain in her hips and pressure in her bladder and rectal areas. (Tr. 32-33). She is able to walk 1-2 blocks, but she has to take breaks. (Tr. 33). Her doctor recommended using a cane, but she does so only on "real, real bad days." (Tr. 32). She can lift only 5-10 pounds. (Tr. 33).

From a mental perspective, Hicks testified that she has trouble concentrating, she suffers from "severe depression and anxiety," she has crying spells every day, and she is afraid of dying from her ailments. (Tr. 35). She feels unproductive and useless because she can no longer work as a teacher. (*Id.*). She does go to church, to doctor's appointments, and to her weekly Bible study class. (Tr. 36).

Hicks testified that she stopped working in July of 2006. (Tr. 38). Up until that time, she had been working as a teacher at a Catholic elementary school. (Tr. 39). When asked why she stopped working, Hicks said, "Due to health reasons. Because my health is deteriorating. And I was laid off because I wasn't performing up to task." (Tr. 38). She said that she tried to return to work in August of 2006, but it "wasn't a good experience"; she was "called in to the office and released from [her] contract" because there were "a lot of complaints." (Tr. 39).

### 3.     *Treating Physician Records*

#### (a)     *Physical Impairments*

The first medical record related to Hicks' physical impairments is a June 5, 2008 letter from Dr. Asok Roy of St. Joseph Medical Center. (Tr. 247). In this letter, Dr. Roy stated that Hicks has been a patient of his office for ten years, that she has a long history of hypothyroidism treated with medication, and that she has developed hypertension (also treated with medication) that appears to be "essential due to morbid obesity." (*Id.*). Dr. Roy further indicated that Hicks

had recently been treated with medication for impaired glucose tolerance, possibly related to diabetes (Type II). (*Id.*). Finally, Dr. Roy stated, "Being under a lot of stress and negative emotions lately her psychological and physical status have been deteriorated." (*Id.*).

Aside from this letter, the record contains the following medical records from Dr. Roy: (1) a December 2009 mammogram order and prescription refill (Tr. 260); (2) an August 6, 2010 record related to a prescription refill, which also indicates that Hicks had been exercising (Tr. 337); (3) a September 20, 2010 referral for a stress test after Hicks complained of "on and off" chest discomfort (Tr. 347); (4) a January 6, 2011 record noting Hicks' request for a colonoscopy to diagnose rectal bleeding and abdominal cramps that Hicks thought might be related to hemorrhoids (Tr. 355); and (5) a January 20, 2011 record reflecting follow-up from Hick's January 6, 2011 visit, where Hicks was continued on her current medications (Tr. 377).

### *(b)   Mental Impairments*

With respect to Hicks' mental impairments, the record contains a July 30, 2008 Adult Clinical Assessment completed by Janet Cooperstock, a therapist at Advance Counseling Services ("ACS"). (Tr. 252-57). At that visit, Hicks indicated that she had been laid off from her teaching job in 2006 because her health was failing, and because she was teaching elementary students, but was only certified to teach secondary students. (Tr. 252-53). She indicated that she wanted to "continue her education and become certified." (Tr. 255). Her leisure and recreational activities included reading, walking, yard work, and gardening. (Tr. 253). Ms. Cooperstock diagnosed Hicks with major depression and generalized anxiety disorder and assigned her a Global Assessment of Functioning (GAF) score of 50.[1] (Tr. 255). Hicks'

---

[1] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Commissioner of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

treatment objectives included leaving the house daily, socializing with friends twice a month, reducing anxiety, worrying less about her health, investigating finding a part-time job to reduce financial stress, returning to school, obtaining needed teaching certification, and obtaining a teaching job (preferably at a Catholic elementary school). (Tr. 256-57). Ms. Cooperstock's treatment plan specified a "time frame" of June 2009 and further indicated that Hicks participated in and approved the plan. (*Id.*).

The only other record from ACS consists of a discharge summary dated October 21, 2008. (Tr. 251). This record indicates that Hicks was seen at ACS for intake and two counseling sessions. (*Id.*). Hicks then cancelled her psychiatric appointment and did not reschedule. (*Id.*). She left against medical advice and was discharged for lack of attendance/contact. (*Id.*). Ms. Cooperstock indicated that further treatment would have focused on eliminating depression and reducing anxiety, and Hicks needed psychiatric evaluation and consistent psychotherapy. (*Id.*). At discharge, Hicks' GAF score was still 50. (*Id.*).

Hicks' only other mental health treatment records come from Swarn Mahajan, M.D., and Sheila Blanding, M.S.W., at New Center. (Tr. 324). These records include an August 16, 2010 Psychiatric Evaluation, an August 30, 2010 Intake Summary, and progress reports showing five monthly treatment sessions through December 17, 2010. (Tr. 324-31). At her Psychiatric Evaluation, Hicks reported that she had worked as a teacher for fifteen years, but lost her job due to "changes in the teaching system." (Tr. 331). She indicated that she wanted to start counseling but refused recommended medication unless she found counseling to be ineffective. (*Id.*). Dr. Mahajan diagnosed Hicks with major depressive disorder and assigned her a GAF score of 50. (*Id.*). Progress notes indicate that Hicks continued to refuse medication until a visit on November 30, 2010, at which time she agreed to medication treatment. (Tr. 327). There are no

other mental health treatment records in the record.

### 4    Consultative Reports

On December 23, 2009, Hicks was examined by a consultative internal medicine expert, Dr. Cynthia Shelby-Lane of Sierra Medical Group.  (Tr. 279-82).  Dr. Shelby-Lane noted Hicks' history of hypothyroidism, hypertension, non-insulin dependent diabetes, and skin infections, all of which are controlled with medication; a history of daily migraine headaches; a history of blurred vision; a history of anxiety and depression, for which she had "been seen by a mental health specialist in the past"; and a history of insomnia, irritable bowel syndrome, upper respiratory infection, and chronic left arm and leg pain.  (Tr. 279-80).  Dr. Shelby-Lane's physical examination findings were entirely normal, however.  (Tr. 280-81).  In conclusion, Dr. Shelby-Lane opined that Hicks needs ongoing care for multiple medical problems and should be maintained on her medication on a lifelong basis.  (Tr. 282).

The record also contains a "Case Analysis" performed by Janet Mathews, a state agency Single Decisionmaker.  This analysis, dated March 17, 2010, concluded that Hicks is capable of occasionally lifting 50 pounds, frequently lifting 25 pounds, and standing and sitting six hours in an eight-hour workday.  (Tr. 305).

On December 23, 2009, Dr. Nick Boneff, Ph.D., performed a consultative psychiatric examination.  (Tr. 273-76).  Dr. Boneff noted that Hicks had previously applied for DIB but had not received benefits.  (Tr. 273).  Hicks complained of "bouts of depression" and anxiety attacks, but denied any history of psychiatric hospitalization.  (*Id.*).  She indicated that she was not taking any psychiatric medications, nor had she done so in the past.  (*Id.*).  Hicks indicated that she last worked as a teacher in 2006, but stopped "because of her medical problems."  (Tr. 274).  She indicated that she gets along "great" with other people, and that she spends her time reading,

10

surfing the internet, listening to music, and attending church functions. (*Id.*). She indicated that she is able to drive, manage money, and take a shower almost every day. (*Id.*). Hicks indicated that "she is depressed most of the time." (*Id.*). She was able to repeat five digits forward and three backward, recall 3/3 objects immediately and 1/3 after a delay of three minutes, and she knew her age and birthdate. (Tr. 275). Dr. Boneff diagnosed Hicks with depression secondary to general medical conditions and assigned her a GAF score of 55. (*Id.*). He characterized her prognosis as "good," and noted that she demonstrated cognitive strengths in concentration, abstract thinking, and immediate and short term memory. (Tr. 276). He concluded by saying that Hicks "would appear to have cognitive capabilities to enable her to engage successfully in work type activities of a moderate degree of complexity, remembering and executing a several step procedure on a sustained basis, with capacity for independent judgment and decision making, and so far as her physical condition allows." (*Id.*).

On March 12, 2010, state agency examiner Dr. Edward Czarnecki, Ph.D., reviewed the evidence of record and completed a Psychiatric Review Technique form, opining that Hicks' mental impairment (affective disorder) is not severe. (Tr. 300). According to Dr. Czarnecki, Hicks has only mild limitations in activities of daily living, maintaining social functioning, and in concentration, persistence, and pace, and she suffered no episodes of decompensation. (Tr. 298). In summary, Dr. Czarnecki concluded that Hicks "alleges primarily physical impairment and pain" and that she "may have some depression related to her physical problems but it is mild with no significant credible associated functional limitations." (Tr. 302).

### 5.    *Vocational Expert's Testimony*

Alberto Sadowski testified as an independent vocational expert ("VE"). (Tr. 40-42). The VE characterized Hicks' past relevant work as a teacher as skilled in nature and light exertion.

11

(Tr. 40).  The ALJ asked the VE to imagine a claimant of Hicks' age, education, and work experience, who was able to perform the full range of medium work without mental limitations. (Tr. 40-41).  The VE testified that the hypothetical individual would be capable of performing Hicks' past relevant work.  (Tr. 41).

### C.    Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Commissioner of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011)

(citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Commissioner of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Secretary of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**D.     The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found that Hicks is not disabled under the Act. At Step One, the ALJ found that Hicks has not engaged in substantial gainful activity since September 1, 2006, the alleged onset date. (Tr. 49). At Step Two, the ALJ found that Hicks has the severe impairments of hypothyroidism, essential hypertension, non-insulin dependent diabetes, and obesity. (*Id.*). The ALJ also found at Step Two that Hicks' affective disorder, while a medically determinable impairment, does not cause more than a minimal limitation on her ability to perform basic mental work activities and, thus, is non-severe. (Tr. 49-51). At Step Three, the ALJ found that Hicks' impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 51-52).

The ALJ then assessed Hicks' residual functional capacity ("RFC"), concluding that she is capable of performing the full range of medium work. (Tr. 52-55). At Step Four, the ALJ determined that Hicks is able to perform her past relevant work as a teacher. (Tr. 55-56). As a result, the ALJ concluded that Hicks is not disabled under the Act. (Tr. 21-22).

**E.     Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Commissioner of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Commissioner of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Secretary of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *Kornecky v. Commissioner of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence

14

submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.   Analysis

### 1.   *The ALJ's Conclusion that Hicks' Mental Impairment Is Not Severe is Supported by Substantial Evidence*

As set forth above, the ALJ found that Hicks has the severe impairments of hypothyroidism, essential hypertension, non-insulin dependent diabetes, and obesity.  (Tr. 49). However, he also found at Step Two that Hicks' affective disorder, while a medically determinable impairment, does not cause more than a minimal limitation on her ability to perform basic mental work activities and, thus, is non-severe within the meaning of the Act.  (Tr. 49-51).  In her motion for summary judgment, Hicks argues that the ALJ's conclusion in this regard is not supported by substantial evidence.

At Step Two of the sequential evaluation process, the ALJ must consider whether a claimant has a severe impairment.  *See* 20 C.F.R. §416.920(a)(4).  "To surmount the step two hurdle, the applicant bears the ultimate burden of establishing that the administrative record contains objective medical evidence suggesting that the applicant was 'disabled,' as defined by the Act . . . ."  *Despins v. Commissioner of Soc. Sec.*, 257 F. App'x 923, 929 (6th Cir. 2007).  The applicable regulations generally define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. §416.920(c).  Basic work activities are defined in the regulations as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §416.921(b).  Examples

15

include:  (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *See id.*

The Sixth Circuit has "characterized step two of the disability determination process as a '*de minimis* hurdle.'"  *Despins*, 257 F. App'x at 929.  "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  Nonetheless, not all impairments are severe:  "The mere existence of . . . impairments . . . does not establish that [the claimant] was significantly limited from performing basic work activities for a continuous period of time."  *Despins*, 257 F. App'x at 930.  In considering whether a claimant has a severe impairment, an ALJ need not accept unsupported medical opinions or a claimant's subjective complaints.  *See Weckbacher v. Commissioner of Soc. Sec.*, 2012 WL 2809697, at *9 (S.D. Ohio July 10, 2012).

With respect to Hicks' mental impairment, there is substantial evidence in the record supporting the ALJ's conclusion that her affective disorder does not rise to the level of a severe impairment under the Act.  The ALJ noted that it was not until July 30, 2008 – nearly two years after her alleged onset date – that Hicks first presented to Advanced Counseling Services.  (Tr. 49-50, 252-57).  At that time, Hicks was alert and oriented to time, place, and person.  (Tr. 254).  Although her recent memory was impaired, her judgment, insight, intelligence, and cognitive function were intact.  (*Id.*).  Her treatment included only two outpatient therapy sessions before she was discharged for lack of attendance/contact.  (Tr. 251).  As the ALJ recognized, Hicks'

16

only other mental health treatment occurred two years later, in August of 2010, at New Center. (Tr. 50). The record contains progress reports reflecting only five monthly treatment sessions at New Center, and the ALJ correctly noted that Hicks initially refused recommended medication. (Tr. 50, 324-331). *See Lemle v. Commissioner of Soc. Sec.*, 2012 WL 1060111, at *9 (E.D. Mich. Jan. 27, 2012) (failure to follow prescribed treatment is evidence supporting ALJ's determination that claimant's testimony was not entirely credible) (citing 20 C.F.R. §404.1530(b) ("If you do not follow the prescribed treatment without good reason, we will not find you disabled.")). Thus, the ALJ's conclusion that the objective medical evidence "does not reflect mental health treatment one would typically expect of an individual with moderate-to-marked mental impairment"[2] (Tr. 49) is supported by substantial evidence.

Hicks argues that her GAF scores of 50 and 55 are "obviously inconsistent" with the ALJ's finding that her mental impairment is non-severe. (Doc. #9 at 10). As an initial matter, however, GAF scores do not conclusively establish the existence of a severe impairment. *See White v. Commissioner of Soc. Sec.*, 2011 WL 5104622, at *3 (E.D. Mich. Oct. 27, 2011) (there is no statutory, regulatory, or other authority requiring the ALJ to "put stock" in a GAF score). In fact, the Sixth Circuit has noted that GAF scores, while potentially useful tools, do not have

---

[2] Hicks argues that, in concluding that her mental impairment is non-severe because it does not cause more than a minimal limitation in her ability to perform basic mental work activities, the ALJ erred in applying this "moderate-to-marked" standard. (Doc. #9 at 9). This argument is without merit, as the ALJ's analysis tracks the precise language and legal standard set forth in the applicable regulations. Specifically, the regulations provide: "When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme." 20 C.F.R. §404.1520a(c)(4). The regulations further provide: "If we rate the degree of your limitation in the first three functional areas as "none" or "mild" … we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities …." 20 C.F.R. §404.1520a(d)(1). Here, the ALJ reasonably found Hicks to have only mild limitations (as opposed to moderate or marked) in each of the first three functional areas; thus, he did not err in finding her mental impairment non-severe.

any "direct correlation to the severity requirements of the mental disorders listings." *DeBoard v. Commissioner of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) (quoting *Wind v. Barnhart*, 2005 WL 1317040, at *6 n. 5 (11th Cir. 2005) and 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). Indeed, a GAF score of 50 does not necessarily demonstrate disability, and courts have affirmed denials of disability benefits when claimants had GAF scores of 50 or lower. *See DeBoard*, 211 F. App'x at 416 (collecting cases). Moreover, the Sixth Circuit has held that an ALJ's failure to reference a GAF score is not, standing alone, sufficient grounds to reverse the ALJ's decision. *Id.* at 416 (citing *Howard v. Commissioner of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). Thus, Hicks' argument that the ALJ erred in omitting mention of her GAF scores is without merit.

Moreover, in concluding that Hicks' mental impairment is non-severe, the ALJ also considered Hicks' hearing testimony and statements made in disability reports. With respect to activities of daily living, the ALJ noted that Hicks understands the importance of personal hygiene, taking prescription medications, performing housework, preparing meals, and managing finances, and she attempts to perform these tasks as frequently as possible. (Tr. 50, 160-61). Her hobbies include reading the Bible, praying, and playing math games or chess on the computer. (Tr. 24, 50, 162). As for social functioning, Hicks reported that she goes to movies and plays, attends church, and spends time with family and friends. (Tr. 50, 162). With respect to concentration, persistence, or pace, the ALJ again noted Hicks' hobbies – all of which require "more than minimal concentration." (Tr. 50). The ALJ also considered Hicks' December 23, 2009 consultative mental status examination, at which she was oriented to time, place, and person; could repeat five digits forward and two digits backwards; could recall 3/3 objects immediately and 1/3 after a delay of three minutes; and was able to perform simple calculations.

(Tr. 50-51, 273-76).   Finally, the ALJ noted that there was no evidence of episodes of decompensation.   (Tr. 51).   In her motion, Hicks does not point to any medical evidence or opinion which suggests that she has greater restrictions in any of the first three functional areas, or that she has suffered episodes of decompensation.   For all of these reasons, the ALJ reasonably concluded that Hicks' mental impairment is not severe, and that conclusion is supported by substantial evidence.

### 2. The ALJ Erred in Failing to Consider Hicks' Mental Impairment When Determining Her RFC

Hicks also argues that, even if the ALJ correctly concluded that her mental impairment is non-severe, he erred in failing to consider this impairment when formulating her RFC.  (Doc. #9 at 10-11) (citing 20 C.F.R. §404.1545(e)).  RFC is a medical assessment of what an individual can do in a work setting in spite of functional limitations and environmental restrictions imposed by all of her medically determinable impairments, including those that are non-severe.  *See* 20 C.F.R. §404.1545.  RFC is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs" on a regular and continuing basis.  *Cohen v. Secretary of Health and Human Servs.*, 964 F.2d 524, 530 (6th Cir. 1992) (internal quotations omitted).

As the Sixth Circuit has recognized, in determining an individual's RFC, "Once one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe."  *White v. Commissioner of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009); *see also* 20 C.F.R. §404.1523 ("In determining whether your physical or mental impairment or impairments are of a sufficient medical severity … we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe

19

combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."); 20 C.F.R. §404.1545(a)(2) ("*If you have more than one impairment.*  We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity.") (emphasis in original).  Moreover, Social Security Ruling 96-8p provides that:

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe."  While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim.  For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

*Social Security Ruling 96-8p*, 1996 WL 374184, at *5 (July 2, 1996).  In summary, once the ALJ determined that Hicks suffers from severe physical impairments – including hypothyroidism, essential hypertension, diabetes, and obesity – he was required to consider these impairments in combination with all non-severe impairments, including Hicks' affective disorder, in assessing her RFC.  *See Simpson v. Commissioner of Soc. Sec.*, 344 F. App'x 181, 190-91 (6th Cir. 2009).

    In this case, it is, at best, unclear whether the ALJ considered the effect of Hicks' mental impairment when formulating her RFC.  Indeed, a fair reading of the ALJ's decision suggests he did not.  After discussing Hicks' mental impairment, and finding it to mildly limit her activities of daily living, social functioning, and concentration, persistence or pace (Tr. 50-51), the ALJ noted that those limitations:

> are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed

assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.[3]

(Tr. 51).

However, the RFC that followed made no mention whatsoever of any limitations resulting from Hicks' mental impairment, and indicated only that Hicks has the RFC to perform "the full range of medium work." (Tr. 52). In fact, the ALJ's four-page RFC analysis does not so much as mention Hicks' mental impairment, and instead addresses only her medically determinable *physical* impairments. *See infra* at 22. (Tr. 52-55). For these reasons, the ALJ's written decision leaves the reader with the impression that he failed to consider Hicks' non-severe mental impairment in formulating her RFC.

The Commissioner argues in response that "the ALJ expressly considered all of [Hicks'] impairments, stating, 'In translating [Hicks'] *medically determinable impairments* into the context of functional limitations…' The ALJ properly considered all of [Hicks'] impairments and accommodated any resulting functional limitations in his RFC finding." (Doc. #13 at 20) (emphasis Commissioner's) (purporting to quote Tr. 53). But this argument fails in several respects.

---

[3] To the extent the Commissioner argues that the ALJ satisfied his obligation by including this last sentence, the court rejects such an argument. *See, e.g., Muzzarelli v. Astrue*, 2011 WL 5873793, at *23 (N.D. Ill. Nov. 18, 2011) (remanding case where the ALJ concluded his Step Two analysis with the same "boilerplate" sentence but failed to discuss the plaintiff's mild limitations in the three functional areas in performing his RFC assessment); s*ee also Risley v. Astrue*, 2010 WL 3860565, at *3 (E.D. Okla. Sept. 15, 2010) ("While the ALJ's determination that the claimant suffered from only mild functional limitations might arguably equate to a finding that her depression was insignificant, the Court may not make this finding for the ALJ."); *Verlee v. Astrue*, 2013 WL 1760810, at *9 (N.D. Ind. Apr. 24, 2013) (remanding where the ALJ "failed to consider the impact of the Plaintiff's non-severe mental impairments in evaluating the Plaintiff's RFC").

First, the Commissioner's argument rests on a misquote of the ALJ's decision; the Commissioner's brief omits the word "physical" in between the words "determinable" and "impairments."  *Cf.* Tr. 53 with Doc. #13 at 20.  The misquote contained in the Commissioner's brief arguably allows the reader to infer, as the Commissioner urges, that the ALJ considered "all" of Hicks' impairments, *i.e.*, both her physical and mental impairments.  The ALJ's actual quote, however, allows no such inference; to the contrary, it supports Hicks' position.  The ALJ actually wrote that he was "translating [Hicks'] medically determinable **physical** impairments into the context of functional limitations."  (Tr. 53) (emphasis added).  Thus, the ALJ's actual statement is more consistent with the above analysis, *supra* at 19-21, which suggests that, although the ALJ provided a thorough discussion of Hicks' physical impairments, his RFC analysis failed to consider the combination of those impairments and Hicks' mental impairments.

Second, and relatedly, after finding Hicks suffers from various mild mental limitations, the ALJ, in his RFC analysis, appears to treat Hicks as if she has *no* mental limitations whatsoever.  This was precisely the error (or at least one of the errors) which led to a remand in the Sixth Circuit case of *Simpson*, 344 F. App'x at 190-91.  In *Simpson*, the ALJ found that while the claimant suffered from various severe physical limitations, her mental limitations were all non-severe.  *Id.* at 187.  The ALJ then wrote "based on my evaluation of the claimant's mental impairment as not a severe impairment ... she does not have any limitations stemming from that mental impairment."  *Id.* at 191.  The Sixth Circuit held that "[t]he ALJ's finding is contrary to controlling law" because, "once it was determined that Simpson suffered from severe physical impairments … the ALJ was required to consider the impairments resulting from this condition and her [non-severe mental impairments] in assessing her RFC."  *Id.* at 190-91.

22

The Eastern District of Michigan reached a similar conclusion in the somewhat analogous case of *Al Ghawalb v. Commissioner of Soc. Sec.,* 2012 WL 2804837, at *6 (E.D. Mich. July 10, 2012).  In *Al Ghawalb*, at Step 2 the ALJ found severe physical impairments, but concluded that the claimant's mental impairments were non-severe.  In reaching the latter finding, the ALJ specifically referenced various psychiatric reports.  However, the ALJ's RFC assessment was silent as to the claimant's mental limitations and did not reference the psychiatric reports.  *Id.* at *6.  The district court remanded the case to the ALJ, in part based on its ruling that:  "an examination of the RFC assessment indicates that the ALJ only considered [Al Ghawalb's physical impairments]…If the Court is to infer that the ALJ used these portions in his RFC assessment, the ALJ must explain why he chose to not credit the evidence… Without an explanation for the exclusion of Plaintiff's psychiatric evaluation in the RFC assessment, this court cannot make a finding there is 'more than a scintilla' of substantial evidence to support the ALJ's RFC assessment."  *Id.* (citations omitted).[4]

Here, the ALJ appears to have made a mistake similar to the ones made in *Simpson* and *Al Ghawalb*.  Particularly when coupled with the ALJ's hypothetical hearing question, which asked the VE to assume a claimant who was able to perform the full range of medium work "without mental limitations" (Tr. 40-41), the ALJ's RFC analysis leaves the reader with the impression that he simply concluded (without any explanation) that Hicks had no mental impairments whatsoever (as in *Simpson*) or that he failed to consider her mental impairments in combination with her physical ones (as in *Al Ghawalb*).  Either way, the ALJ failed to develop a proper RFC.  *See* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. §404.1523; 20 C.F.R.

---

[4]  The court rejects the Commissioner argument that *Al Ghawalb* "stands only for the unremarkable proposition that an ALJ's decision 'must show that the ALJ implicitly resolved conflicts in the record.'"  (Doc. #13 at 19) (quoting *Al Ghawalb,* at *6).

23

§404.1545(a)(2)); *Simpson*, 344 F. App'x at 190-91; *Al Ghawalb*, 2012 WL 2804837, at *6.

In sum, in considering the severity of Hicks' mental impairment at Step Two, the ALJ specifically concluded that she is mildly limited with respect to her activities of daily living; social functioning; and concentration, persistence, or pace. (Tr. 50). However, he made no mention at all of Hicks' mental impairment – or any limitations resulting from that impairment – when analyzing or determining her RFC. (Tr. 52-55). And, in the end, the ALJ concluded only that Hicks has the RFC to perform "the full range of medium work." (Tr. 52). Because it is at best unclear whether the ALJ considered Hicks' mental impairment in determining her RFC, the court cannot conclude that the ALJ's finding that Hicks can perform her past relevant work as a teacher is supported by substantial evidence. *Simpson*, 344 F. App'x at 190-91; *Al Ghawalb*, at *6.

On remand, the ALJ should explicitly discuss Hicks' mild limitations with respect to her activities of daily living, social functioning, and concentration, persistence, or pace in his RFC assessment. In addition, if the resulting RFC does incorporate mental limitations, the ALJ must proceed with a proper Step Four and (if necessary) Five analysis, determining the physical and mental demands of Hicks' past relevant work and/or other work, and whether she has the ability to meet the demands of that work, despite any mental and/or physical limitations.

## III.    CONCLUSION

For foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [13] be DENIED, Hicks' Motion for Summary Judgment [9] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED back to the ALJ for further proceedings consistent with this Recommendation.

24

Dated: May 15, 2013                          s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge

## REVIEW

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

   *Note these additional requirements at the direction of Judge Cleland:*

   Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc. The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

## CERTIFICATE OF SERVICE

   The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class

U.S. mail addresses disclosed on the Notice of Electronic Filing on May 15, 2013.

s/T. Bankston for
FELICIA M. MOSES
Case Manager